If it may please the court, good morning, your honors. My name is John Zuccarini. I am the appellant in this case. I would like to address the court on one important issue of the case, that is, why did the Third Circuit allow me to retain ownership and renew the ownership, which I have been doing on a yearly basis, of the over 5,000 domain names which are subject of the original lawsuit filed by the Federal Trade Commission in 2001? If the Third Circuit had found that both the registration as misleading domain names and redirecting of Internet consumers constituted deceptive acts or practices in violation of the FTC Act, of several possible alternatives, my continued ownership provided the only effective and reasonable means by which the court could have day-to-day control over the domain names and by which the government could respond to any legal actions by parties which may challenge the findings of the court, either by myself or other parties, as overly broad towards issues of allowable commercial speech and protected free speech, that the court's findings should not have been applied to all the domain names that I owned. I don't believe there's any doubt if I wish to petition the Federal Courts to reconsider their findings, I would need to have petitioned the Third Circuit to present reasons why the registration and use of specific domain names should be allowed. The government would respond to my petition, and the court would make a determination in the registration. May I interrupt for a moment with a question? Yes, your honor. What I think we've got here is there's a valid judgment against you for a certain amount of damages, and the question is not whether you're liable on the judgment, that's been established, the question is whether and where the judgment creditor may bring an enforcement suit, and I'm not sure I understand why the argument you're now making is relevant to the question as to where that enforcement proceeding may be brought. Okay, well, the reason I bring this up, your honor, is that I believe the Third Circuit retains jurisdiction over the use of the domain names, and I was trying to just explain why the Third Circuit allowed me to retain ownership that my retaining of ownership allowed challenges to the court's findings to exist, to take place if that were to happen. But is the allowing of retaining of ownership, I don't see how that's relevant to the question as to where an execution proceeding may be brought, because the premise of the execution proceeding is that, in fact, you do own them. Otherwise, there's nothing to execute upon. Well, okay, your honor, I understand, and so I will ask if there's any questions that the court would like to ask of me. At this time, I have none. I'm not sure whether the others on the panel do at this time. No. No, at this time, no. That means you've saved quite a bit of time for response. Let's hear from the other side, and then we'll give you a chance to respond. You'll have plenty of time to respond. All right, thank you very much. Thank you, your honor, and good morning. Henry Burgoyne on behalf of D.S. Holdings and Office Depot. I think the point that your honor just made is the fundamental one to this case. The real question that we're dealing with here is accepting domain names as property. Where is an enforcement action in relation to those domain names properly brought? And I think in order to decide that question, one looks to the nature of domain names as property, and I think the best statement that we have regarding the nature of domain names as property was provided by Judge Kaczynski in the Cramond versus Cohen opinion, which we all cite. And as Judge Kaczynski writes, someone who registers a domain name decides where on the internet those who invoke that particular name, whether by typing it into their web browsers, by following a hyperlink, or by other means, are sent. In other words, the property right is the ability to decide what that domain name points to, what computer it points to, what set of files, usually constituting a website, that domain name points to. And as the district court in this case surmised, in deciding where that right is properly located, the most obvious place to look is the location of the pointer. And the pointer in this case is VeriSign Incorporated, which is located here in the northern district in Mountain View. VeriSign is the entity that has a contract with an organization called ICANN, ICANN being a non-profit corporation organized under the Department of Commerce. In other words, VeriSign gets its power from the Department of Commerce to maintain a database. And the database is a simple list matching a domain name with an IP address. And we're talking here about .com and .net domain names. As your honors in the court understand, there are any number of other top-level domains, .com being a top-level domain. Well, to make an assumption that we understand all this is a heroic assumption. So, does VeriSign have the authority to transfer? It sure does, your honor. The domain name? It sure does, your honor. And this is why I think there are various places that we can look for some indication of whether or not it's proper to regard here, the location of VeriSign as the proper site of a domain name. And I think perhaps the best is the Anti-Cybersquatting Consumer Protection Act, which the district court looks to. And that act contains what I think we can describe as a finding by Congress, that domain should be presumed to be located in two places, the registry, which is VeriSign in this case, or the registrar. Now, a registrar, and I think there's a great summary of the interplay between registries, registrars, ICANN, in the Coalition for ICANN Transparency case that's been cited to your honors. Does it say Judge White's opinion? That's correct. You don't like our appellate opinion on the same question? I mean, it's a fantastic opinion. What I was about to say is there's a second great source for the same information. Essentially, a registrar, and we have to understand what registrars are. There are hundreds of them. They are what we could describe as loosely accredited individual entities, some in the U.S., some located in other countries, which essentially provide a set of ministerial services for registries, such as VeriSign, for whom the registrars work, essentially, with whom they're in contract. Because it would be a gargantuan task for one entity, VeriSign, for example, to take care of all of the registration, specific details of registering names, it contracts with registrars in different areas. Those registrars, for example, if you want to register a domain name, they'll take your registration information, they'll take your payment information, they'll process the fee, they'll kick some up to VeriSign, and they'll say to VeriSign, go ahead and point this domain name at that IP address per the request of the registrant. But it's VeriSign that does the pointing. Yeah. Now, there's some difficulty, potentially, in this lawsuit, and I'm not sure I fully understand how it's going to work out. Assuming that the attachment proceeding goes forward, and assuming that as a result of the attachment names now owned by Mr. Zuccherini will be transferred to you in satisfaction of the judgment debt, it seems to me at least possible that you're going to need jurisdiction over people not within the Northern District of California to accomplish some of those transfers. But it seems to me, and you can correct me if I'm wrong, you can help me understand it, that what Judge Elston did was to appoint a receiver, and that that receiver, if the receiver has to go outside of this district in order to obtain a transfer, the receiver now has the power to do that. That's correct. I think one important predicate to all of this is that registrars, and again, when we're talking about the ultimate thing that needs to be done is VeriSign needs to change its database. Ultimately, no matter how we go about it, what we're asking is that VeriSign, here in Mountain View, change its database. Now, for the convenience, I think, of everyone involved, and because registrars, such as, in this case, Network Solutions, Joker.com, these are the folks that typically handle the details, the administrative details relating to that change. Those are the folks that the district court and, in this case, the receiver are working with to make those, to affect the change, and admitted those folks are outside of the jurisdiction. As far as we know, because we never did discovery on this, my guess, for example, is that Network Solutions has any number of contacts with Northern California, which would permit the court, if it came to that, to take jurisdiction. But I don't think we have to get there, because working as they do with VeriSign, all in the interest of maintaining this database in the most proper way that VeriSign maintains, they have already agreed to cooperate with the receiver. They've waived any argument as to jurisdiction. There is language in certain of the court's orders suggesting that they are to cooperate with the receiver. They're happy to do it, and they have been since the beginning, presuming the receiver is properly appointed by the court. There may be other cases. I should know this. I read the number, and I've now forgotten. What's the amount of the judgment? You know, it climbs every day. Initially, it was just over $100,000 plus some fees. Since that time, the last I was cognizant, it was about $170,000 with interest. I believe it's climbed since then. And the domain names have the sufficient value to ultimately make a substantial satisfaction of the judgment? They do. And I think this, at least in this modern world, is probably the best evidence that we have of the fact that these things are actually property. There is a very active market for trading in domain names. And, in fact, the more the more valuable it is. We see seven-figure deals for names like cellphones.com, cars.com, specifically because these are names that folks who are looking for information on cellphones, they might go to Google and Google cellphones and see what comes up. But a surprising number of folks actually go right to the address line of their browser, and they type in cellphones.com. And then you end up on the cellphones.com page. They have information advertising. They work with companies to make their money. The more generic, the more valuable a name is. It's routine these days in intellectual property transfer agreements, for example, between companies. You will see domain names itemized, separate and apart from trademarks and the goodwill pertinent to those trademarks. You will see domain names and all rights in the domain names sold separately. They're extremely valuable assets. And it's actually the one point that I think needs to be made clear here. Mr. Zuccherini at times makes reference to the fact that he almost treats these things as if they're toxic, these domain names, because when in his hands, they were used for an unlawful purpose. It has nothing to do with the unlawful nature of these domain names. When one looks at the FTC orders, it's clear Mr. Zuccherini was doing a whole bunch of things using these domain names to mimic other bona fide websites and not just by the similarity of the name. He would then draw people into these mock websites, sometimes using actual pop-ups of the real websites. Then he bombarded them with advertisements that they couldn't close. He'd lock up their browsers. A whole collection of bad things Mr. Zuccherini was doing. And as evidence of the fact that these domain names as valuable property are not in and of themselves toxic, the district court actually let him keep them. And if you look at the district court's injunctions, there are record keeping and follow-up requirements regarding Mr. Zuccherini's ownership and use of domain names. So these things are super, super valuable. I don't know in the end whether they're going to be enough to satisfy the judgment. The IRS has a lien. We're cooperating with the IRS in satisfaction of that. Actually, the IRS has four liens. I'm sorry, four liens? That's correct. Totaling, I think, $300,000 to $400,000. So probably not everybody gets satisfied here at the end of the day, but it's a start. Has the IRS brought an unfortunate proceeding here, an execution? No. I think it's safe to say that we're somewhere on the cutting edge here in terms of envisioning ways. Has the IRS brought an execution proceeding anywhere at this point? Not to my knowledge. They've sought to intervene in the lower court. The motion was put off simply for the fact that by the time it would have been heard, the case had already been appealed and was here. We've spoken with the IRS. We've already roughed out, I think, what would be described as a plan of cooperation in terms of who's going to get what if these things are sold. That's your ten minutes? Thank you. Unless there are further questions from the bench? Okay. Thank you very much. Thank you, Your Honor. Mr. Zuccarini, you've got a fair amount of time to respond if you choose to use it. Yes, Your Honor. Just a couple points I would bring up. The claim Mr. Zuccarini made consisting of bombarding users with pop-ups and that would cause a problem with their navigating the Internet. There were some domain names which may have been a problem, but many were not. Yes, although, you see, that doesn't matter to us at this point. I'm quite willing to assume even for purposes of what's in front of us that the behavior was entirely innocent. What you have, however, is a valid judgment against you, and the question is the manner in which it will be executed. Okay. The only other issue I would bring up is the location of the registry which I had maintained in the papers I had filed was in Virginia and not in Detroit. Yes. And so, pretty much, Your Honor, that would be what I would have to say at this time. Yes. I mean, it's a tricky question because any time you're dealing with intangible property, which is what you have here, tangible property is things you can touch, a house, a table, and so on. Intangible property is rights in various things, but you can't touch them. If you're trying to figure out where the, quote, location is of the intangible property, you've got difficulties. And in law, you can sometimes have multiple, quote, locations for the same intangible property for purposes of things like execution. So it's possible that an execution suit on this judgment could have been brought in Virginia as well. And really saying that it could have been brought in Virginia doesn't mean it can't be brought here. Well, I understand what you're saying, Your Honor, and I just felt that the court actions in all cases show that the registry is in Virginia and that the registry is a wholly owned subsidiary of VeriZyne. Okay. And that would be my understanding of the registry and its location. Okay. So that would be, you know, how I would view it. Okay. Any further questions? I'm sorry, go ahead. I didn't mean to interrupt. No, it's just if there's any other issue that I could clarify for you or... Okay. I was just about to ask that very same question. Any other questions from the bench? No, I think not. Unless you have something further, that's all we need. Okay. Well, thank you very much, Your Honor. Thank you very much, and I'm glad you were able to appear by telephone to the expense of flying all the way to this beautiful city of San Francisco. Yes. Well, thank you very much for allowing me to do so. Okay. Thank you. The case of Opposito vs. Zuccherini is now submitted for decision. Thank you. Thank you.
judges: Hall, Fletcher W. , Paez